**THE ROSEN LAW FIRM, P.A.**
Laurence Rosen, Esq.
One Gateway Center, Suite 2600
Newark, NJ  07102
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| LISA MAZZARINO, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ADMA BIOLOGICS, INC., ADAM S. GROSSMAN, JERROLD V. GROSSMAN, and BRAD TADE,<br><br>Defendants. | **Case No:**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u> |

1

Plaintiff Lisa Mazzarino ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the Defendants' public documents, and announcements made by Defendants, public filings, wire and press releases published by and regarding ADMA Biologics, Inc. ("ADMA" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. [1]

## **NATURE OF THE ACTION**

1.　This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded ADMA Biologics securities between August 9, 2024 and March 25, 2026 inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

---

[1] Unless otherwise stated, all emphasis is added and eternal citations are omitted.

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased ADMA securities during the Class Period and was economically damaged thereby.

7.    ADMA describes itself as an "end-to-end commercial biopharmaceutical company dedicated to manufacturing, marketing and developing specialty biologics for the treatment of immunodeficient patients at risk for infection and others at risk for certain infectious diseases."

8.    ADMA's principal executive offices are located at 465 State Route 17, Ramsey, New Jersey, 07746.

9.    ADMA common stock trades on the Nasdaq Global Market ("Nasdaq") under the ticker symbol "ADMA."

10.    Defendant Adam S. Grossman ("Grossman") served as ADMA's Chief Executive Officer ("CEO") and President at all relevant times.

11.    Defendant Jerrold V. Grossman ("J. Grossman") is an ADMA founder and served as ADMA's Vice Chairman at all relevant times.

12.    Defendant Brad Tade ("Tade") served as ADMA's Chief Financial Officer ("CFO") until February 25, 2026. Defendant Tade reportedly informed the Company just a week prior, February 20, 2026, that he was departing the position. As discussed below, the sudden nature and timing of Defendant Tade's departure supports an inference of scienter.

13.    Defendants Grossman, J. Grossman, and Tade are collectively referred to herein as the "Individual Defendants."

14.    Each of the Individual Defendants:

4

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

15. The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

16.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

17.    The Company and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

18.    On August 8, 2024, after the market closed, the Company filed with the SEC its Quarterly Report on Form 10-Q for the period ended June 30, 2024 (the "Q2 2024 Report"). Attached to the Q2 2024 Report were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Grossman and Tade attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

19.    The Q2 2024 Report contained the following statement regarding related party transactions:

> During the six months ended June 30, 2024 and 2023, the Company purchased certain specialized medical equipment and services primarily related to the Company's plasma collection centers, as well as personal protective equipment, from GenesisBPS and its affiliates ("Genesis"), aggregating to $0.1 million and $0.2 million, respectively. Genesis is owned by Dr. Grossman and Mr. Grossman.

20.    The statement in ¶ 19 was materially false at the time it was made because it disclosed purchases from GenesisBPS, but not sales to the similarly

6

named Genesis BioPharma Services, which in fact operates out of ADMA's corporate headquarters.

21. On November 7, 2024, after the market closed, the Company filed with the SEC its Quarterly Report on Form 10-Q for the period ended September 30, 2024 (the "Q3 2024 Report"). Attached to the Q3 2024 Report were signed certifications pursuant to SOX signed by Defendants Grossman and Tade attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

22. The Q3 2024 Report contained the following statement regarding related party transactions:

> During the nine months ended September 30, 2024 and 2023, the Company purchased certain specialized medical equipment and services primarily related to the Company's plasma collection centers, as well as personal protective equipment, from GenesisBPS and its affiliates ("Genesis"), aggregating to $0.2 million and $0.4 million, respectively. Genesis is owned by Dr. Grossman and Mr. Grossman.

23. The statement in ¶ 22 was materially false at the time it was made because it disclosed purchases from GenesisBPS, but not sales to the similarly named Genesis BioPharma Services, which in fact operates out of ADMA's corporate headquarters.

24. On March 18, 2025, after the market closed, the Company filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2024 (the "2024 Annual Report"). Attached to the 2024 Annual Report were signed

7

certifications pursuant to SOX signed by Defendants Grossman and Tade attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud. Defendant J. Grossman signed the 2024 Annual Report.

25.     The 2024 Annual Report contained the following statement about the Company's internal controls:

> Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as of December 31, 2024. The term "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act, means controls and other procedures of a company that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the company's management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure. Management recognizes that any set of controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. ***Based on the evaluation of our disclosure controls and procedures as of December 31, 2024, our Chief Executive Officer and Chief Financial Officer concluded that, as of such date, our disclosure controls and procedures were effective at the reasonable assurance leve***l.

26.     The statement in ¶ 25 was materially false at the time it was made because ADMA lacked effective internal controls, as a result of a scheme to use

channel stuffing to materially inflate ADMA's revenues, and as a result of an undisclosed related party transaction.

27. The 2024 Annual Report contained the following statement regarding related party transactions:

> During the years ended December 31, 2024, 2023 and 2022, the Company purchased certain specialized equipment and repair services used for the collection and processing of source plasma from GenesisBPS and its affiliates ("Genesis") in the amount of $0.2 million, $0.4 million and $0.2 million, respectively. Genesis is owned by Dr. Grossman and Adam Grossman.

28. The statement in ¶ 27 was materially false at the time it was made because it disclosed purchases from GenesisBPS, but not sales to the similarly named Genesis BioPharma Services, which in fact operates out of ADMA's corporate headquarters.

29. The 2024 Annual Report contained the following statement regarding revenue recognition:

> Product revenue is recognized when the customer is deemed to have control over the product and the performance obligation is satisfied. Control is determined based on when the product is shipped or delivered and title passes to the customer. ***Revenue is recorded in an amount that reflects the consideration the Company expects to receive in exchange. Revenue from the sale of the Company's immunoglobulin products is recognized when the product reaches the customer's destination, and is recorded net of estimated rebates, wholesaler distribution and related fees, customer incentives, including prompt pay discounts, wholesaler chargebacks, group purchasing organization fees and reimbursements for patient assistance. These estimates are based on contractual arrangements, historical experience and certain other assumptions, and while the Company believes that such estimates are reasonable, they are subject to change based on future developments and other factors.***

9

30. The statement in ¶ 29 was materially false at the time it was made because it omitted that ADMA ships unwanted amounts of ASCENIV, known as channel stuffing, to create an appearance of heightened demand and revenue.

31. On May 7, 2025, the Company filed with the SEC its Quarterly Report on Form 10-Q for the quarter ended March 31, 2025 (the "Q1 2025 Report"). Attached to the Q1 2025 Report were signed certifications pursuant to SOX signed by Defendants Grossman and Tade attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

32. The Q1 2025 Report contained the following statement regarding the Company's internal controls:

We designed our disclosure controls and procedures, as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), to provide reasonable assurance that information required to be disclosed by us in reports we file or submit under the Exchange Act is (i) recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and (ii) accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosures.

Under the supervision of and with the participation of our management, including our principal executive officer and principal financial officer, we conducted an evaluation of our disclosure controls and procedures as of March 31, 2025. ***Based on this evaluation, our principal executive officer and principal financial officer concluded that our disclosure controls and procedures as of March 31, 2025 were effective*** to provide reasonable assurance that the information required to be disclosed by us in

reports filed under the Exchange Act is (i) recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and (ii) accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding disclosures.

A control system, no matter how well designed and operated, cannot provide absolute assurance that the objectives of the control system are met, and no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within a company have been detected. We do not expect that our disclosure controls and procedures or our internal control over financial reporting are able to prevent with certainty all errors and all fraud.

33. The statement in ¶ 32 was materially false at the time it was made because ADMA lacked effective internal controls, as a result of a scheme to use channel stuffing to materially inflate ADMA's revenues, and as a result of an undisclosed related party transaction.

34. The Q1 2025 Report contained the following statement regarding a related party transaction:

During the three months ended March 31, 2025 and 2024, the Company purchased certain specialized equipment and repair services used for the collection and processing of source plasma from GenesisBPS in the amount of $34 thousand and $0.1 million, respectively. Genesis is owned by Dr. Grossman and Adam Grossman.

35. The statement in ¶ 34 was materially false at the time it was made because it disclosed purchases from GenesisBPS, but not sales to the similarly named Genesis BioPharma Services, which in fact operates out of ADMA's corporate headquarters.

11

36.    The Q1 2025 Report contained the following statement about revenue recognition:

> Revenues are comprised of (i) revenues from the sale of the Company's immunoglobulin products, ASCENIV, BIVIGAM and Nabi-HB, (ii) product revenues from the sale of human plasma collected through the Company's Plasma Collection Centers business segment, (iii) contract manufacturing and laboratory services revenue, (iv) revenues from the sale of intermediates; and (v) license and other revenues primarily attributable to the out-licensing of ASCENIV to Biotest AG ("Biotest") in 2012 to market and sell this product in Europe and selected countries in North Africa and the Middle East. Biotest has provided the Company with certain services and financial payments in accordance with the related Biotest license agreement and is obligated to pay the Company certain amounts in the future if certain milestones are achieved. Deferred revenue is amortized into income over the term of the Biotest license, representing a period of approximately 22 years.
>
> ***Product revenue is recognized when the customer is deemed to have control over the product. Control is determined based on when the product is shipped or delivered, depending on the sales terms, and title passes to the customer. Revenue is recorded in an amount that reflects the consideration the Company expects to receive in exchange***. ***Revenue from the sale of the Company's immunoglobulin products is recognized when the product reaches the customer's destination, and is recorded net of estimated rebates, wholesaler distribution and related fees, customer incentives, including prompt pay discounts, wholesaler chargebacks, group purchasing organization fees and reimbursements for patient assistance. These estimates are based on historical experience and certain other assumptions, and while the Company believes that such estimates are reasonable, they are subject to change based on future experience and other factors.***

37.    The statement in ¶ 36 was materially false at the time it was made because it omitted that ADMA ships unwanted amounts of ASCENIV, known as channel stuffing, to create an appearance of heightened demand and revenue.

12

38.     On August 6, 2025, the Company filed with the SEC its Quarterly Report on Form 10-Q for the quarter ended June 30, 2025 (the "Q2 2025 Report"). Attached to the Q2 2025 Report were signed certifications pursuant to SOX signed by Defendants Grossman and Tade attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

39.     The Q2 2025 Report contained the following statement about the Company's internal controls:

> We designed our disclosure controls and procedures, as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), to provide reasonable assurance that information required to be disclosed by us in reports we file or submit under the Exchange Act is (i) recorded, processed, summarized and reported within the time periods specified in the U.S. Securities and Exchange Commission (SEC)'s rules and forms, and (ii) accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosures.
>
> Under the supervision of and with the participation of our management, including our principal executive officer and principal financial officer, we conducted an evaluation of our disclosure controls and procedures as of June 30, 2025. ***Based on this evaluation, our principal executive officer and principal financial officer concluded that our disclosure controls and procedures as of June 30, 2025, were effective*** to provide reasonable assurance that the information required to be disclosed by us in reports filed under the Exchange Act is (i) recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and (ii) accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding disclosures.

13

A control system, no matter how well designed and operated, cannot provide absolute assurance that the objectives of the control system are met, and no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within a company have been detected. We do not expect that our disclosure controls and procedures or our internal control over financial reporting are able to prevent with certainty all errors and all fraud.

40.    The statement in ¶ 39 was materially false at the time it was made because ADMA lacked effective internal controls, as a result of a scheme to use channel stuffing to materially inflate ADMA's revenues, and as a result of an undisclosed related party transaction.

41.    The Q2 2025 Report contained the following statement regarding a related party transaction:

During the six months ended June 30, 2025 and 2024, the Company purchased certain specialized equipment and repair services used for the collection and processing of source plasma from GenesisBPS in the amount of $0.1 million. Genesis is owned by Dr. Grossman and Adam Grossman.

42.    The statement in ¶ 41 was materially false at the time it was made because it disclosed purchases from GenesisBPS, but not sales to the similarly named Genesis BioPharma Services, which in fact operates out of ADMA's corporate headquarters.

43.    The Q2 2025 Report contained the following statement (in part) about revenue recognition:

Revenues are comprised of (i) revenues from the sale of the Company's immunoglobulin products, ASCENIV, BIVIGAM and Nabi-HB, (ii) product revenues from the sale of human plasma collected through the

14

Company's Plasma Collection Centers business segment, (iii) contract manufacturing and laboratory services revenue, (iv) revenues from the sale of intermediates; and (v) license and other revenues primarily attributable to the out-licensing of ASCENIV to Biotest AG ("Biotest") in 2012 to market and sell this product in Europe and selected countries in North Africa and the Middle East. Biotest has provided the Company with certain services and financial payments in accordance with the related Biotest license agreement and is obligated to pay the Company certain amounts in the future if certain milestones are achieved. Deferred revenue is amortized into income over the term of the Biotest license, representing a period of approximately 21 years.

Product revenue is recognized when the customer is deemed to have control over the product. Control is determined based on when the product is shipped or delivered, depending on the sales terms, and title passes to the customer. ***Revenue is recorded in an amount that reflects the consideration the Company expects to receive in exchange. Revenue from the sale of the Company's immunoglobulin products is recognized when the product reaches the customer's destination, and is recorded net of estimated rebates, wholesaler distribution and related fees, customer incentives, including prompt pay discounts, wholesaler chargebacks, group purchasing organization fees and reimbursements for patient assistance. These estimates are based on historical experience and certain other assumptions, and while the Company believes that such estimates are reasonable, they are subject to change based on future experience and other factors***.

44.     The statement in ¶ 43 as materially false at the time it was made because it omitted that ADMA ships unwanted amounts of ASCENIV, known as channel stuffing, to create an appearance of heightened demand and revenue.

45.     On November 5, 2025, the Company filed with the SEC its Quarterly Report on Form 10-Q for the quarter ended September 30, 2025 (the "Q3 2025 Report"). Attached to the Q3 2025 Report were signed certifications pursuant to SOX signed by Defendants Grossman and Tade attesting to the accuracy of

15

financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

46.    The Q3 2025 Report contained the following statement about the Company's internal controls:

We designed our disclosure controls and procedures, as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), to provide reasonable assurance that information required to be disclosed by us in reports we file or submit under the Exchange Act is (i) recorded, processed, summarized and reported within the time periods specified in the U.S. Securities and Exchange Commission (SEC)'s rules and forms, and (ii) accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosures.

Under the supervision of and with the participation of our management, including our principal executive officer and principal financial officer, we conducted an evaluation of our disclosure controls and procedures as of September 30, 2025. ***Based on this evaluation, our principal executive officer and principal financial officer concluded that our disclosure controls and procedures as of September 30, 2025 were effective*** to provide reasonable assurance that the information required to be disclosed by us in reports filed under the Exchange Act is (i) recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and (ii) accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding disclosures.

A control system, no matter how well designed and operated, cannot provide absolute assurance that the objectives of the control system are met, and no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within a company have been detected. We do not expect that our disclosure controls and procedures or our internal control over financial reporting are able to prevent with certainty all errors and all fraud.

16

47.    The statement in ¶ 46 was materially false at the time it was made because ADMA lacked effective internal controls, as a result of a scheme to use channel stuffing to materially inflate ADMA's revenues, and as a result of an undisclosed related party transaction.

48.    The Q3 2025 Report contained the following statement regarding a related party transaction:

> During the nine months ended September 30, 2025 and 2024, the Company purchased certain specialized equipment and repair services used for the collection and processing of source plasma from GenesisBPS ("Genesis") in the amount of $0.2 million. Genesis was owned by Dr. Grossman and Adam Grossman until September 30, 2025.

49.    The statement in ¶ 48 was materially false at the time it was made because it disclosed purchases from GenesisBPS, but not sales to the similarly named Genesis BioPharma Services, which in fact operates out of ADMA's corporate headquarters.

50.    The Q3 2025 Report contained the following statement (in part) about revenue recognition:

> Revenues are comprised of (i) revenues from the sale of the Company's immunoglobulin products, ASCENIV, BIVIGAM and Nabi-HB, (ii) product revenues from the sale of human plasma collected through the Company's Plasma Collection Centers business segment, (iii) contract manufacturing and laboratory services revenue, (iv) revenues from the sale of intermediates; and (v) license and other revenues primarily attributable to the out-licensing of ASCENIV to Biotest AG ("Biotest") in 2012 to market and sell this product in Europe and selected countries in North Africa and the Middle East. Biotest has provided the Company with certain services and financial payments in accordance with the related Biotest license agreement

and is obligated to pay the Company certain amounts in the future if certain milestones are achieved. Deferred revenue is amortized into income over the term of the Biotest license, representing a period of approximately 21 years.

Product revenue is recognized when the customer is deemed to have control over the product. Control is determined based on when the product is shipped or delivered, depending on the sales terms, and title passes to the customer. ***Revenue is recorded in an amount that reflects the consideration the Company expects to receive in exchange. Revenue from the sale of the Company's immunoglobulin products is recognized when the product reaches the customer's destination, and is recorded net of estimated rebates, wholesaler distribution and related fees, customer incentives, including prompt pay discounts, wholesaler chargebacks, group purchasing organization fees and reimbursements for patient assistance. These estimates are based on historical experience and certain other assumptions, and while the Company believes that such estimates are reasonable, they are subject to change based on future experience and other factors***.

51.    The statement in ¶ 50 was materially false at the time it was made because it omitted that ADMA ships unwanted amounts of ASCENIV, known as channel stuffing, to create an appearance of heightened demand and revenue.

52.    On February 25, 2026, the Company filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2025 (the "2025 Annual Report"). Attached to the 2025 Annual Report were certifications pursuant to SOX signed by Defendants Grossman and Tade attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud. Defendant J. Grossman signed the 2025 Annual Report.

53.    The 2025 Annual Report contained the following statement about the Company's internal controls:

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as of December 31, 2025. The term "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act, means controls and other procedures of a company that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the company's management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure. Management recognizes that any set of controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. ***Based on the evaluation of our disclosure controls and procedures as of December 31, 2025, our Chief Executive Officer and Chief Financial Officer concluded that, as of such date, our disclosure controls and procedures were effective at the reasonable assurance level***.

54.    The statement in ¶ 53 was materially false at the time it was made because ADMA lacked effective internal controls, as a result of a scheme to use channel stuffing to materially inflate ADMA's revenues, and as a result of an undisclosed related party transaction.

55.    The 2025 Annual Report contained the following statement about a related party transaction:

During the years ended December 31, 2025, 2024 and 2023, the Company purchased certain specialized equipment and repair services used for the

collection and processing of source plasma from GenesisBPS and its affiliates ("Genesis") in the amount of $0.1 million, $0.2 million and $0.4 million, respectively. Genesis was owned by Dr. Grossman and Adam Grossman until September 30, 2025.

56.   The statement in ¶ 55 was materially false at the time it was made because it disclosed purchases from GenesisBPS, but not sales to the similarly named Genesis BioPharma Services, which in fact operates out of ADMA's corporate headquarters.

57.   The 2025 Annual Report contained the following statement (in part) about revenue recognition:

Revenues for the years ended December 31, 2025, 2024 and 2023 are comprised of (i) revenues from the sale of the Company's immunoglobulin products, ASCENIV, BIVIGAM and Nabi-HB, (ii) product revenues from the sale of human plasma collected by the Company's Plasma Collection Centers business segment, (iii) contract manufacturing and laboratory services revenue, (iv) revenues from the sale of intermediate by-products and (v) license and other revenues primarily attributable to the out-licensing of ASCENIV to Biotest AG ("Biotest") in 2012 to market and sell this product in Europe and certain countries in Northern Africa and the Middle East. Biotest has provided the Company with certain services and financial payments in accordance with the related Biotest license agreement and is obligated to pay the Company certain amounts in the future if certain milestones are achieved. Deferred revenue is amortized into income over the term of the Biotest license, representing a period of approximately 22 years.

Product revenue is recognized when the customer is deemed to have control over the product and the performance obligation is satisfied. Control is determined based on when the product is shipped or delivered and title passes to the customer. ***Revenue is recorded in an amount that reflects the consideration the Company expects to receive in exchange. Revenue from the sale of the Company's immunoglobulin products is recognized when the product reaches the customer's destination, and is recorded net of estimated rebates, wholesaler distribution and related fees, customer***

*incentives, including prompt pay discounts, wholesaler chargebacks, group purchasing organization fees and reimbursements for patient assistance. These estimates are based on contractual arrangements, historical experience and certain other assumptions, and while the Company believes that such estimates are reasonable, they are subject to change based on future developments and other factors.*

58.   The statement in ¶ 57 was materially false at the time it was made because it omitted that ADMA ships unwanted amounts of ASCENIV, known as channel stuffing, to create an appearance of heightened demand and revenue.

59.   The 2025 Annual Report stated that (in thousands), the Company had received $362.531 in net revenues from ASCENIV.

60.   The $362.531 figure in ¶ 59 was materially false at the time it was reported because the Company used channel stuffing through the Class Period to create an appearance of revenue and growth in sales for ASCENIV.

61.   The statements contained in ¶¶ 19, 22, 25, 27, 29, 32, 34, 36, 39, 41, 43, 46, 48, 50, 53, 55, 57, and 59 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) ADMA Biologics engaged in an undisclosed related party transaction; (2) ADMA Biologics used channel stuffing to create an appearance of revenue; (3) ADMA Biologics lacked adequate internal controls; (4) as a result, Defendants' statements about ADMA

21

Biologics' business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH BEGINS TO EMERGE

62.    On March 24, 2026, Culper Research ("Culper") issued a report entitled "ADMA Biologics Inc (ADMA): Channel Stuffing, an Undisclosed Related Party Distributor, and -3% Real Growth in 2025 vs. +20% Reported." (the "Report").

63.    The Report stated the following:

We are short ADMA Biologics ("ADMA", "the Company"). *We believe ADMA's reported growth is a fiction driven more than entirely by a de facto channel stuffing scheme and an undisclosed related party distributor*. We estimate that, absent channel stuffing, *ADMA revenues declined 3% in 2025 vs. +20% reported*. The ASCENIV growth story is already over, and ADMA shares are headed lower.

64.    The Report further stated:

ADMA Biologics is a reverse merger founded by father-son duo Jerrold and Adam Grossman, who remain Vice Chairman and CEO today. ADMA's flagship product ASCENIV is an IVIG therapy priced at ~$900/gram, a 6-10x premium to standard IVIGs on the basis that its high-RSV-titer blend lowers patient infection risk. ADMA, however, has never run a head-to-head study, so ASCENIV holds a standard PI label. Payors treat ASCENIV as functionally identical to standard IVIGs available at a fraction of the price, and have levied strict prior authorization requirements, step edits, and outright denials. *Providers, facing reimbursement challenges, slowed their ordering, and distributors have been left with excess inventory*. In the face of this backdrop, however, ADMA reported that ASCENIV revenues grew from $92.6 million in 2023 to $362.5 million in 2025. Shares have more than tripled over the past 3 years. **We believe the ASCENIV growth story is total fiction owing entirely to channel stuffing**. (Emphasis and underlining in original)

22

65.    The Report stated the following regarding part of Culper's basis for this opinion:

> We spoke with two high-level employees at one of ADMA's two largest distributors, *each of whom told us independently that starting in 2025, ADMA induced the distributor to stock excess ASCENIV by offering rebates and extended payment termsin order to meet order expectations*. Distributors take unwanted product without having to pay for it, ADMA books the revenues, and reports growth that was never there.

66.    The Report quoted one former employee as making the following statements:

- "Mid-summer of last year [2025], ADMA requested we started buying at a different ordering cycle. We typically had ordered once a month and kept 30 days on hand, and we'd do a monthly order and adjust it based on the previous month's demand, and what was accounted for. Then they started incentivizing us with rebates and extended payment terms to do larger orders and keep more of it on hand. Some of those [payment] terms are out to 120 days now." (formatting altered from original in Report).
- "So I think something they're doing is trying to signal to people like you [investors] that, like it's growing, [but] knowing the activity that I've been seeing, it's like cooking the books a bit." (alterations in original)

67.    The Report stated that Culper had asked the distributor if it had "engaged in any conversations with ADMA that might indicate ADMA's request owed to the Company's expectations of increased demand for ASCENIV." The Report stated that a distributor "*denied this notion, stating instead that actual end-market sales are not increasing at all, from what they can tell*."

23

68.     The Report quoted a former ADMA sales representative as saying that

***"they'll encourage them to order more to goose the channel, and then it just sits***

***there*."**

69.     Culper also stated in the Report the following:

***We obtained ASCENIV sales data from a leading third party vendor, which reveals a significant and widening gap between reported ASCENIV revenues and ultimate utilization, even as growth has slowed over time***. We estimate at least $200 million in ASCENIV inventory now sits in the channel.

70.     The Report further stated the following (and provided the following

image) about the ASCENIV sales data:

ASCENIV sales data we obtained from a leading third party data provider corroborates our view, suggesting that (a) there is a meaningful gap between ADMA-reported revenues and actual utilization, (b) this gap has widened significantly over time, and finally that (c) as much as $200 million in ASCENIV inventory sits in the channel.

Recall that ADMA reports revenues upon delivery to customers (i.e., distributors, and that distributors sell onto end customers. The third-party data that we obtained, pictured below, reflects *both* ADMA's sales of ASCENIV directly to end customers under "*buy and bill*" type arrangements, as well as distributor/wholesaler sales to end customers. As such, we believe that it presents an accurate (and Company-favorable) representation of utilization.

| ASCENIV Revenues (millions) | 2023 | 2024 | 2025 |
|---|---|---|---|
| Third-party provider | $79 | $175 | $241 |
| ADMA reported | $93 | $240 | $363 |
| Difference | $14 | $65 | $121 |
| % difference | 14.8% | 27.0% | 33.5% |
| Cumulative difference (~stocked in channel) | | | $200 |

24

We acknowledge that generally speaking, a company will necessarily supply product to distributors in advance of demand. However, at ADMA, the divergence between ADMA's reported revenues and end usage has **widened** while revenue growth has **decelerated** – utilization is not catching up with channel stocking; it is falling further behind.

71.　The Report further stated:

We believe that, had ADMA held payment terms steady rather than extending terms to inflate reported revenues, the Company would have reported year-over-year revenue declines of 3% in 2025. In other words, **more than the entirety of ADMA's reported growth is explained by channel stuffing**. Our view is consistent with what ADMA's own distributor and physicians have told us – that "*I'm not seeing any trends that signal that it's really growing*" and that patients on ASCENIV have declined in early 2026.

(Italicization and bolding/underlining in original).

72.　The Report further stated the following about an undisclosed related party transaction:

ADMA's problems don't end there [i.e., with channel stuffing]. The Company appears to distribute ASCENIV through Genesis BioPharma Services ("Genesis Bio"), a self-described "*life sciences logistics provider*" that **appears to be controlled by Vice Chairman Jerrold Grossman, operates out of ADMA's own corporate headquarters, and explicitly lists ASCENIV among its product offerings, yet is never named in ADMA's related party disclosures**. Tellingly, ADMA discloses *purchases* from the similarly named but distinct GenesisBPS (an equipment provider; also Grossman-controlled but acquired by GSI in October 2025), but the Company has never disclosed *sales* to the similarly named Genesis Bio. The apparent sleight of hand is notable: by disclosing GenesisBPS and omitting Genesis Bio, ADMA creates the impression of transparency while concealing what appears to be a material distribution relationship.

(italicization, underlining, and bolding in original).

73.    The Report further stated the following about the undisclosed third party (formatting altered from original), and showed the following images:

Our channel stuffing concerns are compounded by related party concerns, as ADMA appears to also distribute ASCENIV via Genesis BioPharma Services ("Genesis Bio")— a company that appears to be controlled by Vice Chairman Jerrold Grossman and lists ADMA's headquarters as its own corporate address.



ADMA does disclose that the Company has made small purchases of "certain specialized equipment and repair services used for the collection and processing of source plasma …" from GenesisBPS (Genesis Blood Product Specialties), which was owned by Jerrold and Adam Grossman "until September 30, 2025." On October 1, 2025—coinciding with this disclosure— GSI Group announced that it would acquire GenesisBPS, which GSI described as "a designer and manufacturer of benchtop blood processing equipment and laboratory consumables."

***However, the similarly named Genesis BioPharma Services ("Genesis Bio") appears to be a distinct entity***, referring to itself as "a division of Technomed Inc" even after the acquisition of GenesisBPS. Genesis

26

BioPharma Services lists its corporate headquarters at 465 Route 17, South Ramsey, NJ – ADMA's corporate headquarters. We called Genesis Biopharma Services and the operator confirmed that we had reached Genesis BioPharma.



While GenesisBPS makes blood processing equipment, Genesis Bio calls itself "a life sciences logistics provider of vaccines, human biologicals, and specialty pharmaceuticals" including ASCENIV.



Source: *Genesis Bio*

Neither Genesis BioPharma nor Technomed are disclosed as subsidiaries of ADMA, and while ADMA discloses its purchases from GenesisBPS, the Company has never disclosed the extent of its sales to Genesis Bio. It is thus

27

unclear to us exactly how much business ADMA could be doing with Genesis Bio, but we find this fact pattern concerning especially in the context of our earlier findings.

74.     The Report noted the following, raising further concerns about the Company, including an auditor resignation and resignations by a director, as well as Defendant Tade:

ADMA's 17-year auditor CohnReznick resigned in 2024 and was replaced by KPMG, who charged 3x the price, and flagged critical audit matters in both 2024 and 2025. A month after CohnReznick's resignation, long-time director Bryant Fong – who had been with ADMA prior to its 2013 IPO – resigned. ADMA agreed to immediately vest his unvested RSUs. Just one month ago, ADMA disclosed that its CFO Brad Tade would be retiring, effective immediately, at just 52 years old.

75.     Counsel confirmed that CohnReznick had resigned as ADMA's auditor in 2024, as well as the timing of Bryan Fong's resignation, as well as Defendant Tade's resignation.

76.     The Report stated the following about internal sales of ADMA stock:

ADMA now appears to be levering up its balance sheet to fund share repurchases, reflecting supposed "confidence in its long-term growth trajectory." This confidence is apparently not shared by insiders, who have collectively sold over $50 million in stock in the past 3 years. CEO Grossman has sold over $20 million and put in place a 10b5-1 sale plan in November 2025. Further, in January 2025, Grossman pledged 712,326 shares – then worth $12.8 million at $17.97 per share – against a personal credit facility. The timing is conspicuous.

77.     On this news, the price of ADMA stock fell $2.26 per share, or 16.6%, to close at $11.33 per share on March 24, 2026, and a further $1.70, or 15%, on March 25, 2025.

28

78.    On March 25, 2025, ADMA issued a press release entitled "ADMA Biologics Addresses Misleading Short-Seller Report." The response stated the following:

> [ADMA] today addressed a report issued on March 24, 2026 by Culper Research (the "Short Report"), a firm that has published similarly negative "research reports" regarding public companies after taking short positions in the stock. The Short Report discloses that Culper Research holds a short position in ADMA. ADMA, and its Board of Directors takes seriously its obligations to fairly and accurately report its operating and financial results and make all public disclosures in accordance with the rules and regulations of the U.S. Securities and Exchange Commission and in accordance with the standards of U.S. GAAP. The Short Report, by contrast, appears premised on speculative assertions derived from unidentified and unreliable sources and contains numerous misleading, false and inaccurate statements. Despite the conjecture pervading the Short Report, ADMA is taking appropriate steps to review the assertions.

79.    In response to ADMA's response to the Culper Report, a prominent analyst downgraded ADMA stock.

80.    On March 26, 2026, before the market opened, Investing.com published an article entitled "Cantor downgrades ADMA Biologics stock rating on short report concerns." The article stated the following, directly referencing ADMA's unpersuasive response to the Culper Report:

> Cantor Fitzgerald downgraded ADMA Biologics (NASDAQ:ADMA) to Neutral from Overweight following pressure on the shares from a short report alleging the company is boosting ASCENIV revenues through channel stuffing. The stock plunged 35.9% over the past week to $9.63, contributing to a 47% decline year-to-date.
>
> The firm suspended its financial model for the company after speaking with management and several investors. ***Investors expressed disappointment in***

29

*the company's response on Tuesday and the lack of direct communication,* which management attributed to being in a quiet period.

*While ADMA Biologics issued a statement, Cantor Fitzgerald said it expected more specific feedback addressing the direct claims in the short report. The firm said it would have increased its comfort if the company addressed all individual items with a stronger defense.*

The downgrade reflects concerns around increased days sales outstanding and accounts receivables. Cantor Fitzgerald said the lack of clarity makes it difficult to recommend investors take advantage of stock weakness. [. . .]

*The firm said investors are looking for a more thoughtful response from the company and want ADMA Biologics to address cash flow inconsistencies*.

81.     On this news, ADMA Biologics stock fell $1.34 per share, or 13.9%, to close at $8.29 on March 26, 2026.

82.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

83.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired ADMA securities publicly traded on the NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives,

30

heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

84.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, ADMA securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

85.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

86.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

87.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of ADMA securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

88.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it

32

impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

89.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- ADMA securities met the requirements for listing, and were listed and actively traded on the NASDAQ, an efficient market;

- As a public issuer, the Company filed public reports;

- the Company communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

90.    Based on the foregoing, the market for the Company securities promptly digested current information regarding the Company from all publicly

33

available sources and reflected such information in the prices of the common units, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

91.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

**COUNT I**
**For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All Defendants**

92.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

93.    This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

94.    During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order

to make the statements made, in light of the circumstances under which they were made, not misleading.

95.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

96.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control

over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

97.     During the Class Period, Defendants acted with scienter in that they knew or otherwise were deliberately reckless in not knowing that the public statements disseminated on behalf of ADMA were materially false and misleading at the time they were made, as a result of the fact that ADMA, among other misconduct, engaged in an undisclosed related party transaction with an entity that reputedly operates out of ADMA's own headquarters. Further, Defendant J. Grossman would know the entity was related since it is an entity he controls. Defendant J. Grossman also knows the requirement to disclose the related party transaction at issue since ADMA selectively disclosed other related party transactions involving Defendant J. Grossman. In addition, to date, ADMA has not provided a competing inference to allegations regarding an undisclosed related party transaction or improper revenue recognition by meaningfully responding to the Report, causing an analyst to downgrade ADMA stock. Further, the sudden retirement of Defendant Tade as well as the resignation of ADMA's longstanding auditor further supports the allegation that Defendants acted with scienter.

36

98.    Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other ADMA personnel to members of the investing public, including Plaintiff and the Class.

99.    As a result of the foregoing, the market price of ADMA securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of ADMA securities during the Class Period in purchasing ADMA securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

100.    Had Plaintiff and the other members of the Class been aware that the market price of ADMA securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Company securities at the artificially inflated prices that they did, or at all.

101.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

102.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of ADMA securities during the Class Period.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

103.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

104.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's misstatement of revenue and profit and false financial statements.

105.    As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

106.    Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the

contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Company securities.

107.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of herself and the Class, prays for judgment and relief as follows:

(a)     declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)     awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)     awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.

Dated: June 10, 2026

**THE ROSEN LAW FIRM, P.A**
<u>/s/ Laurence M. Rosen</u>
Laurence M. Rosen, Esq.
One Gateway Center, Suite 2600
Newark, NJ 07102
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*